In re CHADSEY.

(Supreme Court, Appellate Division, First Department. December 30, 1910.)

1. ATTORNEY AND CLIENT (§ 38*)—DISBARMENT—UNPROFESSIONAL CONDUCT.
   An attorney is justified ·in seeking the possession of incriminating letters written by his client if he has no purpose· of suppressing evidence which might be relevant in some litigation then contemplated.
   [Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 51–61; Dec. Dig. § 38.*]

2. ATTORNEY AND CLIENT (§ 38*)—DISBARMENT—UNPROFESSIONAL CONDUCT.
   Where an attorney, in seeking the possession of incriminating letters written by his client, made threats which would have constituted blackmail if they had been made with a view of extorting money, he was guilty of unprofessional conduct and showed a lack of appreciation of the rules by which a lawyer's conduct should be regulated, authorizing suspension.
   [Ed. Note.—For other cases, see Attorney and Client, Cent. Dig. §§ 51–61; Dec. Dig. § 38.*]

Proceedings against Nathan B. Chadsey for disbarment. Respondent suspended from practice for six months.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGH-- LIN, SCOTT, and DOWLING, JJ.

Einar Chrystie, for petitioner.
Charles A. Boston, for respondent.

SCOTT, J. The respondent, an attorney of this court, comes before us charged by the Association of the Bar of the City of New York with unprofessional conduct. The charge rests upon certain letters written by respondent to one Charles R——. , The sending of the letters and the circumstances under which they were sent are admitted, so that there remains no disputed question of. fact in the case, and consequently there is no necessity for sending the matter to a referee.

· The respondent was attorney for one F. C. Brown, a clergyman who had been subjected to the disciplinary power of the church to which he was attached. Charles R——, a resident of Connecticut, wrote a letter to a newspaper published in South Norwalk, Conn., in which he animadverted most severely upon the actions of the clergyman, Brown, accusing him of having made a deliberate and systematic attempt to win the affections and undermine the honor of the writer's daughter. R—— did not fail to protest his firm belief that his daughter had preserved her innocence, but insisted that the clergyman's efforts to lead her astray were none the less reprehensible because they had been unsuccessful.

This letter was published in the South Norwalk newspaper in April, 1908, and in the same month an article based thereon and re-

flecting upon the said Brown was published in a New York newspaper. Nearly two years afterwards, the respondent was retained by Brown, and set to work to seek redress for his client. On January 1, 1910, he wrote a letter to R——, stating his intention to sue for libel, and suggesting that the publication was of a character to justify the recovery of exemplary damages which, in case the judgment was not satisfied, would result in physical incarceration. The letter concludes with a reflection upon the character of R——'s daughter and a threat to put her on the stand and "prove the truth." It should be remarked here that the threatened action for libel against R—— does not appear to have been brought; but, shortly after the correspondence to be hereafter referred to, an action was brought against the New York newspaper which had republished the libel. To thoroughly understand the correspondence, it was also necessary to note that the charges against Brown before the church authorities, upon which he was unfrocked, were based upon certain letters admittedly written by him to Miss R——, and which were in possession of her father. It is manifest that the possession or suppression of these letters would have been of the utmost advantage to Brown in any action he might bring against any one for a libel based upon the facts stated in R——'s letter to the Connecticut newspaper. As has been said, the libel suit with which respondent threatened R—— does not appear to have been brought, but an action for libel was soon afterwards (in February, 1910) begun against one of the newspapers which had reprinted the substance of R——'s charges against the ex-clergyman, Brown.

The letter quoted above from the respondent to R—— led to a very accrimonious correspondence. On January 11, 1910, R—— wrote a caustic reply to respondent's letter of January 1st, in the course of which he said:

"I have in my possession two score or more letters, with other memoranda, which the Baptist Association passed upon and on the strength of which your client was unfrocked and fired out of the ministry."

To this letter respondent replied, saying:

"When you speak of letters you fail to realize that I possess letters written by your daughter Clara, and they speak for themselves. However, your letter holding up your daughter to public scorn stamps you as an apology for a father; and when your treatment of your daughter is considered by an impartial world no wonder that suppressed emotion finds clandestine exudation. The situation is simple; if my client is guilty, then your daughter shares his ignominy, in which case she too becomes answerable in an action for alienations of wife's affections. 'A word to the wise is sufficient.'"

This was followed a few days later by a letter to R—— in which respondent laid down what he terms a "few fundamental principles" of law, which he deemed to be, in some way, applicable to his client's cause, and ended by threatening a criminal prosecution if R—— should publish Brown's letters or even expose them to the view of strangers. In reply R—— wrote that no one had seen or handled the letters except the church authorities, who had the right; that, so far as the writer and his family were concerned, the whole matter was a closed chapter, and the letters would remain inviolate and secure from publicity; that respondent's client, Brown, had nothing

to fear so long as he did not interfere with the writer or his family. The letter ended with an invitation to respondent to express his views along the foregoing lines. Respondent, having gained a promise that the letters should not be made public, undertook to press his advantage further and compel the delivery of the possession of the letters. He wrote a most extraordinary letter to R——, in which, by way of introduction, he intermingled scriptural quotations with alleged extracts from Miss R——'s letters to Brown, leading up to his expressed opinion that the "pair are in pari delicto." He then proposes that, if R—— will turn over all the letters which he possesses or controls written by Brown, he will be forgiven for his published libel. Respondent then suggests that the publication of the letters without permission of the writer would subject the publisher to a criminal prosecution, and calls attention to a case in which a person was being criminally prosecuted by the federal authorities for publishing a stolen letter written by a cabinet officer. Inclosed in this letter was a newspaper clipping referring to the prosecution above mentioned, and stating that the person accused had been brought into court handcuffed and held to bail. This letter was followed by one suggesting that Brown might desire to take proceedings to review the action of the church authorities in unfrocking him, and seeking assurance that Miss R—— would support his plea that he had been guiltless of wrongdoing. The latter points out that, if Brown was guilty, Miss R—— must have been equally guilty, and that, unless she denied guilt, she would be liable to an action by Brown's wife for alienation of her husband's affection. Not receiving the assurance he wished, respondent wrote another letter, in which he declared that he had an affidavit showing that Miss R—— had been guilty of immorality with another man than Brown, and that he (respondent) would produce the witness at the trial. He does not specify at what trial and does not indicate how the evidence of any such witness could be relevant upon the trial of any action arising out of the alleged libel.

The respondent, admitting all the facts, protests that it was well within his rights as an attorney to seek the possession and suppression of letters of a compromising character, written by his client, and which had already been the means of bringing disaster and disgrace upon him. If this were all that is implied in the charges, we might not feel called upon to act. When the letters were written by respondent to R——, no action was pending, and we consider that Brown and his attorney were justified in seeking the possession of the incriminating letters, if they had no purpose of suppressing or destroying evidence which might be relevant in some litigation then contemplated. The respondent denies that he contemplated at this time bringing the action for libel against a New York newspaper, which he begun very shortly afterward; but his letters show very clearly that he did contemplate a legal proceeding of some nature for the purpose of reviewing the action of the ecclesiastical authorities which had unfrocked his client. In such a proceeding the possession and control of the incriminating letters would be of great value to respondent and his client. The offense of which we find the re-

spondent guilty was not in seeking to obtain possession of the letters, but in the means he adopted to compel their delivery. These means included the following distinct threats: First, that letters would be published showing that R——'s daughter had been guilty of illicit relations with Brown; second, that R——'s daughter would be shown to have had illicit relations with another man (not named); third, that R——'s daughter would be sued by Brown's wife for alienating her husband's affection; fourth, that R—— himself might be criminally prosecuted under the federal statutes for publishing a letter without the consent of the writer.

The methods thus adopted by respondent to accomplish his purpose, however innocent that purpose might have been, were absolutely and wholly unjustifiable. If the same threats had been made with a view to extorting money, whether for the benefit of the respondent or of his client, we should have no difficulty in finding respondent guilty of an attempt at blackmail. They were not made with a view to extorting money, and he was not therefore guilty of a criminal offense; but from a professional point of view it is as culpable to use threats to obtain possession of incriminating papers as it is to extort money. The relation of a lawyer to the community requires that the profession shall be kept an honorable one, and, when we are called upon to consider the professional conduct of a member of the bar, our power to act is not limited to cases in which a technically criminal act has been committed. In our opinion the respondent in the means he adopted to secure possession of the incriminating letters was guilty of unprofessional conduct and showed a complete lack of a due appreciation of the rules of ethics by which a lawyer's conduct should be regulated.

He was evidently very young, and was apparently fired with an intense zeal to serve his client, and it is quite possible that he did not understand that he was acting dishonestly and unprofessionally. We give him the benefit of that assumption, but that merely serves to palliate, not to excuse, his conduct. It is regrettable that the respondent even now seems to be quite insensible that he has been guilty of any impropriety. His answer not only justifies his actions, but indicates a feeling on his part that his course has been actually commendable.

That it may be impressed upon his mind, as well as upon the minds of others who may be subjected to similar temptations, that zeal for a client's cause will not justify dishonorable and unprofessional conduct, the respondent will be suspended from practice for six months and until the further order of this court, with leave to apply for reinstatement at the expiration of said six months, upon proof that he has actually abstained from practice during that period and has otherwise properly conducted himself. All concur.